Mark W. Fidanza (*Pro Hac Vice* Forthcoming)
Email: mfidanza@reedsmith.com
Timothy J. Muyano (*Pro Hac Vice* Forthcoming)
Email: tmuyano@reedsmith.com
REED SMITH LLP
1717 Arch Street, Suite 3100
Philadelphia, PA 19103

Olivia M. Treister (SBN 341191)
Email: otreister@reedsmith.com
REED SMITH LLP
515 South Flower Street, Suite 4300
Los Angeles, CA 90071

*Attorneys for Plaintiffs*
Lolita Samarini and Manatek
Commercial Insurance Services, Inc.

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LOLITA SAMARINI, an individual; and MANATEK COMMERCIAL INSURANCE SERVICES, INC., a California corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> RYAN SPECIALTY, LLC, a Delaware limited liability company; DAVID BUCHANAN, an individual; ROBERT ALKIRE, an individual; JEFF ACKMAN, an individual; RUBIN INSURANCE AGENCY, a California corporation; TRUCORDIA INSURANCE SERVICES LLC, a Delaware limited liability company; NAVIGATORS, A BRAND OF THE HARTFORD, a New York corporation; <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR:** <br><br> **1. BREACH OF CONTRACT;** <br> **2. DEFAMATION;** <br> **3. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** <br> **4. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** <br> **5. VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *et seq.*);** <br> **6. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *et seq.*);** <br> **7. CONSPIRACY;** <br> **8. FALSE ADVERTISING UNDER THE LANHAM ACT (15 U.S.C. § 1125(a));** <br> **9. NEGLIGENT SUPERVISION, HIRING, AND RETENTION** |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 1 –

Plaintiffs Lolita Samarini ("Ms. Samarini") and Manatek Commercial Insurance Services, Inc. ("MCIS" and together with Ms. Samarini, "Plaintiffs") hereby allege as follows.

**NATURE OF THE ACTION**

1.     Plaintiffs bring this action seeking relief from a systematic and malicious attempt by institutional specialty insurance wholesalers and their principals as well Plaintiffs' industry competitors ("Defendants") to professionally malign and defame Plaintiffs – a small but successful commercial insurance broker – and squeeze Plaintiffs out of the specialty insurance industry for Defendants' own pecuniary gain.   The conduct at issue is bad enough on its face, but it is made more egregious that it was undertaken by licensed insurance professionals acting on behalf of large corporate brokerages and agencies.

2.     While there may be nothing inherently wrong with business expansion and increasing shareholder value, the ends do not always justify the means.  Corporate greed and the desire for personal financial gain do not give license to engage in market manipulation through unlawful conduct.  That is precisely what happened here, and the financial harm to Plaintiffs is significant, not to mention the additional unquantifiable losses caused by reputational damage and industry standing built over 30 years in the tight-knit industry.

3.     Defendants' misconduct leads to cascade of economic harm that goes far beyond Plaintiffs.  Indeed, Plaintiffs provide a valuable and necessary service to small businesses across the country – namely, shopping insurable risks to various carriers to obtain competitive bids for insurance policies that are critical to operation of the insureds' businesses.  By systematically and intentionally seeking to damage Plaintiffs and drive them out of the market, Defendants leave Plaintiffs' small business clients without access to much needed competitive pricing.  Having nowhere to go, those small businesses must turn to Defendants and the higher-premium policies their carriers offer. Those increased costs then get passed down to consumers.  The net result is to pad

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Defendants' pockets on those backs of those hard-working small businesses and the public they serve.

4. Defendants must be held accountable. Plaintiffs filed this action to do just that.

**PARTIES**

5. Plaintiff Ms. Samarini is an individual who resides in Los Angeles, California. Ms. Samarini is a licensed insurance broker in California, License No. 0C50106.

6. Plaintiff MCIS is a California corporation with a principal place of business in Los Angeles, California. MCIS is a licensed insurance brokerage in California, License No. 0E86543. Ms. Samarini is the sole licensed broker employed by MCIS.

7. Defendant Ryan Specialty, LLC ("Ryan Specialty") is a Delaware limited liability company with a principal place of business and headquarters of 155 N. Wacker Drive, Suite 4000, Chicago, Illinois 60606. Defendant Ryan Specialty maintains offices in California, including in Los Angeles County.

8. Defendant David Buchanan is an individual residing and/or conducting business at 1850 Mt. Diablo Blvd., Suite 160, Walnut Creek, California 94596. Mr. Buchanan is Vice President of Transportation at Ryan Specialty. At all material times described herein, Mr. Buchanan was acting on behalf of, and within the scope of his employment for, Ryan Specialty.

9. Defendant Robert Alkire is an individual residing and/or conducting business at 709 South Harbor City, Suite 400 Melbourne, Florida 32935. Mr. Alkire is employed as a Vice President at 5Star Specialty Programs, Inc. ("5Star"), a subsidiary of CRC Insurance Services, LLC ("CRC"). However, to the extent allegations are made against Mr. Alkire in this action, they are specifically alleged against Mr. Alkire in his personal capacity and ***not*** in his capacity as an employee/agent of 5Star because, upon information and belief, the claims alleged against Mr. Alkire plausibly involve conduct

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

that was *not* authorized to be undertaken and/or was not otherwise within the scope of his employment with 5Star.[1]

10.   Defendant Jeff Ackman is an individual residing and/or conducting business at 5075 Shoreham Place, Suite 100, San Diego, California 92122.

11.   Defendant Rubin Insurance Agency is a California corporation with a principal place of business at 18211 Via De Sueno, Rancho Santa Fe, California 92067.

12.   Defendant Trucordia Insurance Services LLC ("Trucordia") is a Delaware limited liability company with a principal place of business at 2745 W 600 N, Suite 100, Lindon, Utah 84042.

13.   Navigators, A Brand of the Hartford ("Navigators") is an insurance company and a New York corporation with a principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.

## JURISDICTION AND VENUE

14.   This action for false advertising arises under Section 43(a) of the Lanham Trademark Act of 1946 (15 U.S.C. § 1051 *et seq.*) (the "Lanham Act"), California's False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*) (the "FAL"), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*) (the "UCL"), breach of contract, defamation, intentional interference with contractual relations, intentional interference with prospective economic relations, conspiracy, and negligent supervision, as detailed herein.

15.   This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over the related state and common law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

---

[1] Plaintiffs intend to commence a separate arbitration action against CRC, 5Star, and Mr. Alkire (acting in his capacity as an employee of 5Star and within the scope of his employment duties) based upon similar subject matter. Because such claims are governed by the terms of a mandatory arbitration agreement, they are not asserted herein.

COMPLAINT

16. The Court has personal jurisdiction over Defendants because each Defendant transacts business in the state of California and promotes their insurance products and services bearing statements that are false or misleading and likely to confuse consumers and others in the industry within the state.

17. Venue is proper in this District under 28 U.S.C. § 1391 (b)(2) and (c)(2) because a substantial part of the events giving rise to this action have occurred and will continue to occur within this District.

## FACTUAL ALLEGATIONS

**A.    The Specialty Insurance Industry Generally**

18. This case deals with a niche (but substantial) market within the United States insurance industry.

19. Generally speaking, the insurance industry is comprised of markets that can be characterized as "admitted" or "non-admitted" markets.

20. The admitted insurance market is comprised of insurance carriers licensed to write business on an "admitted" basis by the insurance commissioner of the state in where a risk is located.

21. Insurance rates and forms in the admitted market are highly regulated by each state and coverages are largely uniform.

22. Admitted markets are more traditional lines of insurance familiar to the public where insurance carriers are directly licensed and regulated by the state departments of insurance ("DOI") where they operate and insure risks.

23. On the other hand, in the non-admitted market, non-admitted insurance carriers conduct business through wholesale insurance brokers without the need for state DOI licensing. While still bound by various state laws and regulations, non-admitted insurers have greater flexibility to cover high-risk, complex, or specialized risks.

24. Throughout the insurance industry, various insurance professionals, known as "agents" and "brokers" work to shop, place, underwrite, administer,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 5 –

coordinate, and manage insurance coverages and claims on behalf of insureds and insurers. Agents are those professionals who work on behalf, and represent the interests of, insurance companies. Brokers are those professionals who work on behalf, and represent the interests of, insureds.

**B.     The E&S Market**

25.     This case deals primarily with the non-admitted market commonly referred to as the "Excess and Surplus" or "E&S" market.

26.     The E&S market is driven by the continued emergence of large, complex, and high-hazard risks across many lines of insurance.

27.     Unlike admitted carriers, E&S carriers often have more flexibility to quickly adjust coverage terms, pricing, and conditions in response to market needs or dynamics. In the insurance industry, this practice is known as "freedom of rate and form."

28.     Because of this flexibility, E&S underwriters can tailor insurance products to meet emerging risks, the needs of insureds, and the risk appetite of insurance carriers, which in turn helps facilitate coverage that would not otherwise be attainable by would-be insureds.

29.     In the E&S market, a surplus lines transaction is facilitated through a licensed and regulated surplus lines broker. In this market, brokers themselves are subject to special licensing, tax, and due diligence requirements and are regulated by state regulators.

30.     In general, an insured typically does not purchase insurance coverage directly from the ultimate insurance carriers—this is true for both the admitted and E&S markets.

31.     In the admitted market, an insured presents its insurance needs to a retail insurance agent who then facilitates insuring standard risk via an admitted carrier.

32.     However, in the E&S market, although an insured still utilizes a retail insurance agent or broker, the agent or broker turns to a distributor, such as Ryan

– 6 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Specialty, who then submits the larger complex E&S risk to an E&S or specialty insurance carrier.

33.    Ryan Specialty depicted this "U.S. insurance distribution value chain" in its recent Annual Report filed with the SEC:



*See* Ryan Specialty Holdings, Inc., U.S. Securities and Exchange Comm. Form 10-K (Feb. 12, 2026) (available at https://ir.ryanspecialty.com/financial-reports/sec-filings/content/0001849253-26-000006/ryan-20251231.htm ) (last accessed March 2, 2026) ("**Figure 1**").

34.    The E&S industry continues to grow and trend upward. In 2024, the E&S industry as a whole was responsible for $130 billion of direct written premiums.

35.    In fact, according to leading credit rating agency in the world specializing in the insurance industry, AM Best, as of 2024, the E&S market represents over 25% of the entire market share as a percentage of total U.S. commercial insurance premiums.

36.    Each party in this lawsuit is a player in the E&S market.

## C.     Plaintiffs' Commercial Insurance Broker Business

37.     Plaintiff MCIS is a commercial insurance broker registered in California, Texas, Louisiana, Missouri, Alabama, and Virginia.

38.     Ms. Samarini is the Managing Principal at MCIS.

39.     MCIS works primarily in the automobile fleet industry, serving companies that operate large fleets of vehicles such as taxis, buses, limousines, and tow trucks.

40.     The majority of MCIS's clients operate in the tow truck industry.

41.     Many, though not all of Plaintiffs' tow truck company clients are "independent roadside assistance contractors" with the AAA Auto Club and its state or local affiliates.  As contractors of AAA's affiliates, they are given priority to assist with roadside assistance needed by AAA's large consumer membership.  As a result, such contractors often derive a large source of revenue from their status as a contractor with AAA.   To maintain contractor status, tow truck operators must maintain, among other things, certain levels of insurance provided by carriers with certain ratings.   The standards for coverage and insurer rating with which contractors must comply are set by AAA.

42.     Fleet insurance for tow trucks is generally more expensive than for other types of commercial fleets due to the high-risk nature of the work.  As compared to other fleet vehicles, and due to the nature of the work they perform, tow trucks are more frequently involved in accidents that cause damage to surrounding vehicles and other property.  Many insurance carriers are not willing to work with clients in the tow truck industry because there is a high risk of loss.  Thus, would be insureds in the tow truck business depend on specialty insurance markets, like the E&S market, to insure their risks.

43.     The limited number of insurance carriers that are willing to work with tow truck companies in the E&S market are referred to as "Specialty Insurers."

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 8 –

COMPLAINT

44. Specialty Insurers typically do not work directly with insureds or retail agents. Instead, they work through specialized agents known as "Managing General Agents" or "MGAs." MGAs are independent companies—not employees of the Specialty Insurers—that serve as agents on behalf of the Specialty Insurers.

45. MGAs typically work on a commission basis.

46. Specialty Insurers grant MGAs authority to handle significant portions of the insurance process, including policy applications, underwriting, policy approvals, and claims management.  As a result, MGAs are the express agents of the insurance carriers they represent.  *See* Cal. Ins. Code § 769.80 *et seq*.

47. MGAs typically enter into "Producer Agreements" with retail insurance brokers. These agreements establish a formal relationship that authorizes the broker to conduct business with the MGA and, by extension, with the Specialty Insurers the MGA represents.

48. As a result, as set forth in Figure 1, companies seeking coverage from Specialty Insurers cannot simply contact the insurer directly or work with any broker. Instead, they must engage a broker that has an established relationship with the relevant MGAs.  This structure creates a closed network with significant barriers to entry, limiting access to specialty insurance markets to those brokers who have cultivated relationships within this tightly-knit industry.

49. After policies are issued and risks are insured pursuant to the above specialty insurance chain, insureds can submit claims as provided for in those policies. These claims are tracked, in part, by a "loss run report."

50. Loss run reports are referred to as "loss runs" in the industry.

51. Loss runs a report documenting all the claims an insured has made to an insurance company during a specified period, typically one year. A loss run, which is generated by the insurance carrier or MGA, contains a detailed summary of each claim, including the type of claim, the date it was filed, reserve projections, the amount paid by the insurer, and whether the claim remains open or has been closed.

– 9 –

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

52.    When a retail broker submits an insurance application to a wholesale specialty insurance distributor on behalf of a client seeking specialty insurance, the broker typically includes the loss runs from the prior five years. Loss runs serve as a historical record of the client's claims, allowing prospective insurers to assess the risk profile of the insured and establish appropriate premium pricing for the upcoming policy period.

53.    Loss runs are typically deemed confidential and proprietary business documents that may not be shared without express authority from the MGA or carrier that generated the loss runs.  They also often contain protected personal information ("PI") regarding insureds that may not be disseminated without the express consent of the insured.

54.    Loss runs can be generated by an MGA or insurer at any time, including upon request by the insured.  Because claims develop over time, loss runs generated on different dates may reflect different or updated information about the same claim.  In other words, a loss run provides a snapshot of the insured's claim history as of the moment in time when the report is generated.

55.    Although loss runs are designed to provide an accurate assessment of the claims made by an insured, in practice, they are often riddled with errors and inconsistencies.  Indeed, MCIS regularly receives loss runs from MGAs that are incomplete and/or incorrect.   In fact, MCIS has received materially incorrect loss runs from both Ryan Specialty and CRC.

56.    As a commercial broker, MCIS facilitates placement of insurance policies with Specialty Insurers on behalf of its clients.

57.    As part of this process, MCIS submits loss runs to secure these specialty insurance policies for its clients who need it.

58.    MCIS, primarily due to the hard work of Ms. Samarini, is a very successful commercial broker in the auto fleet insurance industry, with over 30 years of

– 10 –

COMPLAINT

experience, historically placing in excess of $20 million in annual coverage premiums across general liability and workers compensation lines in that industry.

59.     MCIS's historical success is based in part on the policies placed and the relationship MCIS previously enjoyed with Defendant Ryan Specialty and CRC.

**D.      Ryan Specialty's E&S Dominance**

60.     Defendant Ryan Specialty is an MGA, and Defendant David Buchanan is the Vice President of Transportation at Ryan Specialty.

61.     Ryan Specialty is a publicly traded company of the New York Stock Exchange (RYAN). *See* Ryan Specialty Holdings, Inc., U.S. Securities and Exchange Comm. Form 10-K (Feb. 12, 2026) (available at https://ir.ryanspecialty.com/financial-reports/sec-filings/content/0001849253-26-000006/ryan-20251231.htm ) (last accessed March 2, 2026) (the "Ryan Specialty 10-K").

62.     Ryan Specialty is an international specialty insurance service firm that provides specialty products and solutions for insurance brokers, agents, and carriers in the property and casualty insurance market. *Id.* at 1.

63.     Ryan Specialty generates its revenue by providing "distribution, underwriting, product development, administration, and risk management services through our wholesale brokerage platform and, on behalf of insurance carriers, through delegated underwriting authority via our managing underwriter, binding authority, and national program operations." *Id.*

64.     Ryan Specialty's stated "mission is to provide industry-leading innovative solutions for insurance brokers, agents, and carriers." *Id.*

65.     Ryan Specialty's comprehensive book of business in the insurance industry includes an "excess and surplus, or "E&S" line of business.

66.     Ryan Specialty operates in both the "admitted" and "non-admitted" insurance markets.

67.     For its part, Ryan Specialty continues its efforts to increase its market share in these booming markets.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 11 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

68. Ryan Specialty acknowledges that "[h]istorically, smaller wholesale insurance brokers have relied on a go-to-market strategy that is primarily predicated on facilitating access to underwriting capacity." However, Ryan Specialty sees a different future for the E&S market and has stated that "simply offering market access to retail insurance brokers is no longer sufficient."

69. Ryan Specialty believes that "as risks become more complex, the E&S market will continue to become more material and wholesale brokers that do not have sufficient scale or the financial and intellectual capital to invest in the required specialty capabilities will struggle to compete effectively."

**E.    Ryan Specialty's Profit Model**

70. Ryan Specialty primarily makes its profits by offering its retail insurance broker partners multi-channel access to the E&S market through three "Specialties": (1) Wholesale Brokerage; (2) Binding Authority; and (3) Underwriting Management. Upon information and belief, Ryan Specialty also generates profit by (4) leveraging and monetizing data.

*i.    Wholesale Brokerage Specialty*

71. The Wholesale Brokerage Specialty predominantly operates under the brand "RT Specialty" and "assists retail brokers in procuring a wide range and diversified mix of specialty property, casualty, professional lines, personal lines, and workers' compensation insurance products from insurance carriers."

72. The Wholesale Brokerage Specialty focuses on specialty insurance product that retail brokers have difficulty placing and distribution on their own due to the unique nature or size of the risk. The Wholesale Brokerage Specialty does business with thousands of retail brokerage firms, including all of the 100 largest U.S. retail brokers in addition to small and mid-size retail brokerage firms.

73. Ryan Specialty knows that small- to mid-size retail brokerage firms, like MCIS, do not have direct access to certain insurance carriers with which Ryan Specialty does business.

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

74. Ryan Specialty openly admits that it will "continue to benefit from the consolidation of wholesale broking relationships" in the industry.

75. The host of complex insurance risks that the Wholesale Brokerage Specialty deals with range from kidnap and ransom exposures to trucking fleets and commercial transportation liability.

### ii. *Binding Authority Specialty*

76. According to Ryan Specialty, the Binding Authority Specialty "provides timely and secure access to our carrier trading partners that have delegated underwriting authority and critical administrative and distribution responsibilities to us through our in-house binding agreements." A majority of this business consists of larger volume, smaller premium policies with well-defined underwriting criteria which allows Ryan Specialty to "combine swift turnaround with the authority to bind insurance carriers to coverage regardless of the complexity of risk."

77. The Binding Authority Specialty likewise distributes insurance solutions to a variety of industry distribution channels, which includes the transportation industry. Transportation insurance solutions include risks in areas such as primary and excess auto liability, business auto, public auto, auto physical damages, trailer interchange, and contingent liability, and cargo.

### iii. *Underwriting Management Specialty*

78. The Underwriting Management Specialty operates under multiple brands, but Ryan Specialty collectively refers to those brands as "Ryan Specialty Underwriting Managers" ("RSUM"). RSUM offers insurance and underwriting, product development, administration and risk management services by acting as a wholesale broker and a managing underwriter.

### iv. *Leveraging and Monetizing Data*

79. Another competitive advantage in the E&S market is Ryan Specialty's ability to leverage technology, including artificial intelligence, analytics and customized technology platforms.

– 13 –

80.    When contracting with brokers like MCIS, Ryan Specialty and/or its subsidiaries specifically contract to allow Ryan Specialty to use data and information received in conjunction with the broker relationship to be used to help Ryan Specialty "optimally deliver existing products and services or develop new products and services."

81.    Under these contractual provisions, Ryan Specialty is allowed to use broker data and information in a variety of ways including research, internal analysis, analytics, and for sharing with third parties.

82.    Ryan Specialty has made a concerted effort to ensure it has "amassed a large underlying data set based on the over 1.25 million total policies bound annually." It plans "to leverage this data" to improve and refine its pricing models, enhance its policy placement advice, and increase efficiency.

83.    Moreover, Ryan Specialty has also created its own digital marketplace, RT Connector, which allows quotes to be received and policies bound online. RT Connector utilizes highly automated underwriting criteria that "can produce multiple bindable quotes sourced from high-quality carriers across several risk classes in minutes."

84.    Upon information and belief, Ryan Specialty's technology solutions are highly valuable and contribute to a competitive edge in the market.

85.    Upon information and belief, the large data set Ryan Specialty has "amassed" and "leverage[d]" to improve its business operations and products offered includes data provided pursuant to agreements with brokers like MCIS.

86.    Indeed, Ryan Specialty's RSUM has been commended by leading insurance industry agencies for its product innovation related to sharing data insights.

87.    AM Best found that RSUM's ability to "co-invest, share data insights, and participate strategically with carrier trading partners significantly enhances its relationship strength, market responsiveness, and long-term partnership sustainability."

– 14 –

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

88.    Thus, the value Ryan Specialty derives and earns from its contractual relationship with brokers, and MCIS specifically, is not limited to commissions, fees, or payments.

89.    Upon information and belief, Ryan Specialty derives independent economic value from its collection, retention, and use of data and information received in connection with the commercial relationship with its brokers—including data and information received from MCIS specifically.

## F.    Ryan Specialty's Profits

90.    Ryan Specialty's insurance operations are highly successful and profitable.

91.    In 2025, Ryan Specialty generated $3.05 billion in total revenue—over $2.99 billion of which was derived from net commissions and fees—and a total net income of $214 million.

92.    In 2025, the Wholesale Brokerage Specialty alone generated $1.6 billion in net commission—with the Binding Authority and Underwriting Management Specialties generating $370 million and $1.02 billion respectively.

## G.    Ryan Specialty's Industry Authority and Reputation

93.    Critical to Ryan Specialty's success is its reputation and extensive network of contacts throughout the entire insurance industry.

94.    In its SEC filings, Ryan Specialty brags at length about how trusted in the industry, describing itself with phrases like:

a.    "best-in-class wholesale professionals in the industry"

b.    "trusted and long-standing relationships";

c.    "quality unmatched by most of our competitors";

d.    "[o]ur executive management team has long-standing relationships with the leadership teams at numerous retail brokerage firms";

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 15 –

COMPLAINT

e. "believe our carrier relationships are built on trust, industry credibility, and our ability to deliver attractive underwriting results, growth, and scale over the long term";

f. "industry leading specialized underwriting talent"; and

g. "[o]ur Wholesale Brokerage Specialty has extensive relationships with blue-chip insurance carriers and retail insurance brokers."

95.    In fact, in May 2025, AM Best, the leading credit ranking agency for insurance companies, published a performance assessment of RSUM in which it assessed RSUM at "PA-1" or "Exceptional."

96.    In that performance assessment, AM Best discussed the impact of RSUM's (and Ryan Specialty's) high regard in the industry on its success.

97.    AM Best commended RSUM for its "extensive broker distribution network" and "longstanding carrier trading partnerships."

98.    Indeed, "RSUM's value proposition is deeply embedded in its ability to cultivate, sustain, and expand strategic relationships with retail brokers and global insurance carriers. These relationships form the bedrock of RSUM's enduring market success and long-term growth potential."

99.    AM Best further explained that RSUM benefits from its "reputational excellence and market trust."

100.   AM Best specifically noted:

> RSUM's reputation as a reliable, conflict-free intermediary is central to its relationship strategy. Its absence of retail brokerage operations eliminates potential channel conflicts, fostering transparency and trust among brokers and carriers alike. This reputation, complemented by consistent underwriting performance, technological innovation, and disciplined governance, ensures that RSUM remains a preferred trading partner for top-tier brokers, insurers, and strategic collaborators worldwide.

101.   Indeed, AM Best's performance assessment makes clear that RSUM (and therefore Ryan Specialty's) authority and respect in the market extends to Ryan Specialty's individual employees as well.

– 16 –

COMPLAINT

102. Like its brands, Ryan Specialty's and RSUM's individual talent and employees are highly respected in the industry.

103. AM Best noted that "RSUM's senior leadership team is composed of seasoned industry professionals with extensive knowledge across the insurance sectors and jurisdictions in which the organization operates."

104. In no uncertain terms, AM Best, one of the most highly regarded agencies in the entire insurance industry concluded that RSUM sits in a "leading market position."

105. In sum, when it comes to the E&S market, when Ryan Specialty speaks, the industry listens. And Ryan Specialty knows that.

**H.     The Ryan Specialty Producer Agreement**

106. On July 8, 2022, Ryan Specialty and MCIS entered into a "National Producer Agreement" (the "Producer Agreement"). A true and correct copy of the Producer Agreement is attached hereto as **Exhibit A**.

107. That Producer Agreement allowed MCIS access to specialty insurance carriers in the E&S market by way of Ryan Specialty's wholesale distribution network and provides for a relationship that is national in scope to eliminate the need for MCIS to execute a separate broker or producer agreement with different Ryan Specialty branches, offices, subsidiaries, and affiliates in order to secure specialty E&S insurance for its clients.

108. Undergirding the core purpose of the Producer Agreement is the principle that the parties would work together and in good faith and deal fairly to place insurance for MCIS's clients with Ryan Specialty's network of carriers. Indeed, in the Producer Agreement, MCIS and Ryan Specialty specifically agreed that they wished to *mutually benefit* and improve the overall efficiency of the insurance business.

109. The Producer Agreement is governed by the state law of Illinois.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 17 –
COMPLAINT

110. At a high level, the Producer Agreement created a "Producer" and "Provider" relationship between MCIS and a number of Ryan Specialty provider entities and/or subsidiaries.

111. Under this contractual arrangement, MCIS served as the "Producer" and Ryan Specialty entities served as the "Provider(s)."

112. The Producer Agreement was executed by Ryan Services Group, LLC ("RSG"), a subsidiary of Ryan Specialty, LLC, on behalf of itself and additional Ryan Specialty providers. Additional Ryan Specialty entities expressly referenced in the Producer Agreement include RSG Underwriting Managers, LLC (d/b/a RSG Insurance Services, LLC) and R-T Specialty, LLC (d/b/a R-T Specialty Insurance Services, LLC and R-T Specialty of Florida, LLC).

113. Under the Producer Agreement, the Ryan Specialty entities agreed to pay to MCIS a commission in the amount of a percentage of the premiums of the insurance policies placed by MCIS through Ryan Specalty's insurance products and solutions. *See* Producer Agreement § 5.01.

114. The Producer Agreement provides as follows with respect to data collection and use by Ryan Specialty: "RSG [a "Provider"] may use PI [insured "Personal Information"] and other information received in conjunction with this Agreement or the use of Sites to create non-identifiable information that RSG may use alone or in the aggregate with information obtained from other sources, in order to help RSG to optimally deliver existing products and services or develop new products and services. Additionally, RSG may use PI and other information about insureds, prospective insured and Producers to create anonymized and aggregated information, such as de-identified demographic information, de-identified location information, information about the computer or device from which a person accesses the Sites, or other analyses RSG creates. Anonymized and aggregated information is used for a variety of functions, including the measurement of visitors' interest in and use of various portions or features of the Site. Anonymized or aggregated information is not PI, and

– 18 –

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

RSG may use such information in a number of ways, including research, internal analysis, analytics, and any other legally permissible purposes. RSG may share this information within RSG and with third parties for RSG's or such third parties' purposes in an anonymized or aggregated form that is designed to prevent anyone from identifying insureds, prospective insureds, and Producers." *Id.* § 11.04.

115. The Producer Agreement also provides that: "Providers hereby agree to indemnify, defend and hold harmless the Producer, its officers, directors, and employees from any and all losses, liabilities, suits, claims, expenses, reasonable attorneys' fees, penalties or fines arising from the acts, errors or omissions of the Providers, ***whether intentional or unintentional***. This Section 10.02 will survive the termination of this Agreement." *Id.* § 10.02 (emphasis added).

116. The Producer Agreement "may be terminated by [either party] for any reason by written or electronic notice to the other Party stating when such termination is to be effective." *Id.* § 9.01.

## I.     CRC Insurance Services, LLC

117. CRC Insurance Services, LLC ("CRC") is another leading specialty insurance service firm. Like Ryan Specialty, CRC provides specialty wholesale and underwriting services to retail brokers.

118. CRC and MCIS entered into a Brokerage Agreement on or around May 23, 2022 ("CRC Agreement").

119. In recent years, MCIS developed a strong working relationship with CRC's subsidiary, 5Star Specialty Programs, Inc. ("5Star"), which serves as the MGA for several carriers. In 2025 alone, MCIS placed approximately $5 million in auto fleet liability premiums, as well as over $1.3 million in worker's compensation premiums, all through 5Star.

120. The policies placed by MCIS with 5Star have been very profitable for the 5Star carriers and have resulted in very favorable Broker loss ratios.

121. Defendant Robert Alkire is a Vice President at 5Star.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**J.      Rubin Insurance Agency and Trucordia**

122.    Defendant Rubin Insurance Agency is a commercial insurance broker and a competitor of MCIS.

123.    Trucordia is the group name for a top 20 U.S. insurance brokerage headquartered in Lindon, Utah. The Trucordia group of companies offers a broad array of commercial and personal lines, life and health, and employee benefits insurance solutions. As shown in the screenshot below taken from Trucordia's public facing webpage on March 2, 2026, Trucordia holds out Rubin Insurance Agency, Inc. on as a Trucordia company.  Therefore, at all material times, Rubin Insurance Agency was acting in its capacity as an agent of, and within the scope of its agency, on behalf of its principal, Trucordia.

124.    Defendant Jeff Ackman was formerly employed by Rubin Insurance Agency, but he now uses an email address ending with "@trucordia.com."  Therefore, upon information and belief, Mr. Ackman is currently an employee of Trucordia.

125.    Mr. Ackman and his Rubin Insurance Agency colleagues are publicly identified as "Partners" of Trucordia who are part of Trucordia's "collective success."



126.    Mr. Ackman has a close business relationship with Mr. Alkire and, upon information and belief, with Mr. Buchanan.

**K.      Ryan Specialty Begins a Campaign of Retaliation Against Plaintiffs**

127.    In approximately November 2024, the insurance policy for one of MCIS's larger clients in California, United Towing & Transport Inc. ("United Towing CA"), was due to be renewed.  At the time, the policy was placed through Ryan Specialty, acting as MGA for Navigators.

COMPLAINT

128. When it came time for MCIS to renew the policy for United Towing CA, Plaintiffs informed Ryan Specialty that they found a new carrier that could provide extremely competitive rates.

129. After Plaintiffs made Ryan Specialty aware of the competing provider and lower rates, Mr. Buchanan, Vice President of Ryan Specialty, became upset at the potential loss of a commission-paying policy placement, and falsely accused Plaintiffs of submitting false loss runs to get a lower rate with the competition.

130. Mr. Buchanan gave no explanation for his false claim but instead threatened to send purportedly false loss runs out to other MGAs in the industry to defame Plaintiffs.

131. Mr. Buchanan's unsupported claims about false loss runs are particularly egregious because Ryan Specialty later provided materially incorrect loss runs *for United Towing (CA)* under a policy for which Ryan Specialty was the MGA. More specifically, on October 13, 2025, Ryan Specialty provided a loss runs to MCIS for United Towing (CA) on a policy having a term from 11/24/22 to 11/24/2023 that purported to be "Current as of: Monday, October 13, 2025 12:00 AM EST" and reported "no claims," even though there were in fact 35 claims at the time. MCIS had to advise Ryan Specialty that the loss run it provided was materially incorrect, after which, on October 15, 2025, Ryan Specialty provided a new loss run to MCIS for that exact same policy and term, which loss run was also represented to be "Current as of: Monday, October 13, 2025 12:00 AM EST" and which included 35 claims, but was still missing standard information on amounts incurred and paid for each claim.

132. Ryan Specialty's false accusations about Plaintiffs later broadened. Indeed, Mr. Buchanan, has repeatedly published false and defamatory information about MCIS to third parties, thereby causing significant business and reputational harm to MCIS, and setting off a cascade of additional harms to MCIS's clients (*i.e.*, insureds).

133. Making Mr. Buchanan's comments even more egregious and further showing his malicious intent towards MCIS, Mr. Buchanan remarked in an email to Ms.

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Samarini and fellow Ryan Specialty Account Executive Ms. Kathleen Martinez that Ms. Samarini's clients engaged in practices that "looks like fraud."

134.    After Ms. Samarini explained why her client's actions were legitimate business actions and not fraud, Mr. Buchanan left her with a kind parting message:



135.    Then, in an email dated March 3, 2025, Mr. Buchanan falsely claimed to David Pourati, Esq.— a lawyer who inquired about the identity of the insurer providing coverage for a particular tow truck owned by MCIS's client, Armada Towing—that the "Certificate of Insurance" purportedly issued by MCIS reflecting coverage provided by MS Transverse Specialty Insurance Company ("Transverse") policy was the result of "FRAUD." In that same email, Mr. Buchanan provided Mr. Pourati with MCIS's contact information, advised that MCIS was the agent for Armada Towing, and specifically told Mr. Pourati that "I would not trust her [Ms. Samarini]."

136.    Within minutes of that email exchange with Mr. Pourati, Mr. Buchanan hastily emailed Ms. Samarini to state: "Why is an attorney contacting us on a claim with Armada? We do not insure Armada  - WE STATED CLEARLY THAT WE WILL NOT BE ADDING THEM[.] I am reporting this to the department of insurance."

137.    But there was no fraud, and there was not even any misconduct. MCIS has never issued a Certificate of Insurance to Armada for any Transverse policy. Moreover, as Mr. Buchanan knew at the time, Ryan Specialty, acting as MGA for Transverse, issued a coverage endorsement on December 15, 2024 for the Armada vehicle at issue, and then cancelled the same on December 23, 2025, by backdating the effective date of the cancellation to December 15, 2023. Thus, the most likely reason

– 22 –

for the confusion was that Armada's tow truck driver gave the wrong insurance card to the police at the scene of the accident. Surely that would be understandable given Ryan Specialty's abrupt change of position and backdating cancelling endorsements.

138. Undeterred by truth or reason, unburdened by the decency to investigate notwithstanding express knowledge that Ryan Specialty itself created confusing circumstances regarding coverage, and in utter disregard of its duty to deal in good faith and fairly with Plaintiffs, Mr. Buchanan jumped right to publishing false and defamatory statements about Plaintiffs and then threatening to report them to the DOI.

139. Mr. Buchanan's egregious misconduct has not only damaged MCIS's business relationships with its clients such as Armada, which later heard about Mr. Buchanan's claims of fraud, but it has harmed the reputation of MCIS and Ms. Samarini personally.

140. Since that March 3, 2025 incident, MCIS has also learned from Mr. Alkire that Mr. Buchanan has contacted Mr. Alkire at 5Star and made claims that MCIS engaged in fraud and/or misrepresentation.

141. Ultimately, Mr. Buchanan's defamatory statements evince the intentionality and maliciousness of his conduct and Ryan Specialty's conduct towards Plaintiffs. Indeed, because Mr. Buchanan claims he is "very careful with [his] words," he cannot claim his defamatory and disparaging comments towards Plaintiffs were accidental, a mere oversight, or hyperbole. To the contrary, his words are exactly what he intended – to publicly malign and accuse Plaintiffs of professional misconduct and to cause harm to Plaintiffs and their business.

142. On March 11, 2025, Counsel for Plaintiffs sent a cease-and-desist letter to Ryan Specialty addressed both to CEO Timothy W. Turner and Mr. Buchanan (the "Cease and Desist Letter"). Among other things, that Cease and Desist Letter demanded that Ryan Specialty and Mr. Buchanan immediately cease and desist from spreading further unsubstantiated and false allegations about fraud, misrepresentations, or other misconduct by MCIS and/or Ms. Samarini.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 23 –

143. The Cease and Desist Letter laid out in detail the specific statements and false accusations made by Mr. Buchanan as well as Mr. Buchanan's attempts to interfere with MCIS's business.

144. At about this same time, Ryan Specialty terminated the Producer Agreement without giving Plaintiffs any notice, as required by the express terms thereof. Instead, Plaintiffs learned that their business relationship with Ryan Specialty had been terminated when, on or around March 27, 2025, MCIS submitted an application to Ryan Specialty on behalf of a client and the application was not accepted on the grounds that MCIS's relationship with Ryan Specialty was terminated.

## L. Ryan Specialty Caused CRC & 5Star to Engage in Similar Improper Behavior

145. As explained above, Mr. Buchanan called Mr. Alkire, a Vice President of 5Star, during which he made false statements regarding the Plaintiffs and encouraged Mr. Alkire to take action against Plaintiffs. That began an ongoing and coordinated campaign by Mr. Buchanan and Mr. Alkire to systematically force Plaintiffs out of the marketplace.

146. In approximately mid-March 2025, Plaintiffs learned of Mr. Buchanan's spread of false information about Plaintiffs to Mr. Alkire from Mr. Alkire himself. At that time, 5Star began improperly issuing notices of cancellation and/or non-renewal for numerous policies placed by MCIS through 5Star. Many of the stated reasons for those cancellations or non-renewals were false and/or pretextual.

147. Additionally, as a result of Ryan Specialty's false statements, 5Star engaged in numerous other improper and unlawful acts, including threatening insureds with cancellation of coverage if the insureds did not change their Broker or Record ("BOR") designations to remove Plaintiffs and replace them with Defendant Jeff Ackman of the Rubin Insurance Agency.

148. 5Star also threatened to withhold payment of return premiums owed to insureds as leverage to extract payments from MCIS, and openly and falsely accused

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 24 –

COMPLAINT

MCIS of fraud to third parties, including MCIS's clients. In fact, as of the date of this filing, 5Star still owes United Towing & Transport over $42,000 in refunds/credits which CRC's management has ordered not to be released to the insured or the premium finance company because the insured is affiliated with Plaintiffs.

149. CRC also terminated its agreement with MCIS and severed the relationship on June 16, 2025.

## M.    Ryan Specialty Influenced Defendant Jeff Ackman to Interfere with Plaintiffs' Business

150. Mr. Ackman worked together with Ryan Specialty and 5Star to engage in misconduct as part of the campaign to push Plaintiffs out of the market, which financially benefitted Mr. Ackman because it interfered with MCIS's ability to compete with Mr. Ackman's business in the market.

151. For example, Mr. Ackman accepted the BOR designation for those MCIS clients that were threatened to transfer their BOR designations under 5Star's threat of cancellation. Upon information and belief, Mr. Ackman accepted a commission of 5% on those policies (approximately half of the customary broker's commission) due to the unique and convenient circumstances of essentially being given MCIS's clients by 5Star.

152. Mr. Ackman also made false statements to MCIS's clients to defame Plaintiffs with the goal of stealing Plaintiffs' book of business. For example, after MCIS's business relationships with Ryan Specialty and 5Star were wrongfully terminated, MCIS struggled to place insurance for its insured, Armada Towing. At the same time (approximately March 2025), Mr. Ackman was trying to win Armada Towing's business by alleging Plaintiffs committed fraud and offering to work with Mr. Alkire to place coverage with 5Star. Although Plaintiffs do not know the specific statements made by Mr. Ackman in this regard, they learned from their client, Armada Towing, that Mr. Ackman defamed Plaintiffs. Armada Towing ultimately remained

– 25 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

loyal to MCIS, but Mr. Alkire's and Mr. Ackman's efforts reflect the calculated efforts to interfere with and harm MCIS's business for their own individual gain.

153. In another example, after 5Star improperly and pretextually non-renewed a policy for MCIS client United Towing (Alabama) on the apparent sole basis that MCIS was the broker, Mr. Ackman worked with Mr. Buchanan to obtain a new policy for United Towing (Alabama) with a different carrier. This tactic fed both Defendants' pockets and deprived Plaintiffs of the renewal commission on the policy, which had an annual premium of over $500,000.

154. More recently, in February 2026, Mr. Ackman called the principal of Eagle Rock Towing, who is not a client of Plaintiffs, and claimed that Ms. Samarini was selling fake insurance and committing fraud with respect to policies sold to Plaintiffs' client, MT Towing. Plaintiffs came to learn of this defamatory act because the principal of Eagle Rock Towing called the owner of MT Towing, Hamid Julian, and told him about the call. Mr. Julian then told Ms. Samarini what he had learned. Subsequently, Mr. Ackman called Mr. Julian directly, but Mr. Julian did not answer or call Mr. Ackman back.

## N. Defendants Interfere with MCIS's New Program of Insurance

155. Because Ryan Specialty and 5Star have systematically undertaken efforts to deprive Plaintiffs of the ability to access carriers historically willing to write insurance policies for MCIS's clients, Plaintiffs have developed relationships with new carriers and their respective MGAs.

156. One such relationship forged by Plaintiffs has been with the MGA known as Risk Placement Services ("RPS").

157. RPS serves as the MGA for, among other insurers, Crum & Forster Insurance ("CFI"), National Indemnity Insurance Company, and Navigators.

158. Working with RPS, Plaintiffs requested insurance quotes for their clients from CFI, but Plaintiffs learned from RPS that CFI was contacted by both Mr. Buchanan and Mr. Alkire in or around the Summer of 2025, at which time both each separately

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

claimed that Plaintiffs were engaged in fraudulent insurance practices and that CFI should not write insurance policies for Plaintiffs.

159. According to RPS, as a direct result of those defamatory statements, Plaintiffs were unable to obtain quotes for numerous clients from CFI. In fact, it took many months of Plaintiffs trying to negotiate with CFI to quote coverages. Only after Plaintiffs affirmatively represented to CFI that they would be commencing legal action against Defendants (as well as CRC/5Star) that CFI agreed to issue a coverage quote. Since the time Defendants contacted CFI to defame Plaintiffs, Plaintiffs have only obtained a *single* quote from CFI, notwithstanding submitting numerous additional applications for coverage.

160. Mr. Buchanan has also directly called Casey Powell of RPS, at which time Mr. Buchanan disparaged and defamed Plaintiffs and insisted RPS not work with Plaintiffs. Mr. Powell personally reported this phone call to Plaintiffs in or around July/August 2025.

161. Additionally, Plaintiffs have placed insurance on behalf of their clients with Universal Casualty Risk Retention Group ("UCRRG") and reinsured by AXA XL and Lloyds of London ("New Program"). The MGA for the New program is International Standard Transport Risk, LLC dba International Standard Transport Risk, LLC dba (and in California and Florida, STR Managing General Insurance Agency) ("STR").

162. Unhappy that Plaintiffs have been able to retain clients and place insurance in the New Program, Defendants turned their efforts to defaming Plaintiffs by alleging that Plaintiffs are peddling a "fraudulent" New Program of insurance.

163. Specifically, upon learning that Plaintiffs placed insurance in the New Program, Mr. Ackman called Ray Posey, Vice President of the Automotive Club of Southern California ("AAA") to advise that the New Program being brokered by Plaintiffs was fraudulent and should be rejected by AAA. Plaintiffs are aware of the existence of this call because Mr. Posey advised Plaintiffs about it.

– 27 –

164. Upon information and belief, Mr. Alkire also called Mr. Posey and defamed Plaintiffs by claiming that they are brokering the sale of fake or fraudulent insurance.

165. Nothing about the New Program is fake, fraudulent, or otherwise improper. However, Mr. Ackman's and Mr. Alkire's effort to influence AAA worked, as confirmed by a February 13, 2026 Roadside Service Bulletin (the "Bulletin") issued by AAA to its contracted tow truck drivers. The Bulletin included a screen shot of a "Certificate of Insurance (COI)" that AAA claimed "is fraudulent." The screen shot was a redacted version of a COI provided by Plaintiffs to a client covered by the New Program.

166. Although AAA made no specific mention of Plaintiffs and the COI was redacted to protect the identity of Plaintiffs and their insured, there was no secret to those in the industry that that the Bulletin was intended to further Defendants' narrative that Plaintiffs are engaging in fraudulent business practices.

167. Indeed, on February 19, 2026, Mr. Ackman send the following text message to Mike Armada, the President of Plaintiffs' client, Armada Towing, referring to the Bulletin as being "on Lolita" (*i.e.*, Ms. Samarani):



Seen the release on Lolita and the certs with the rrg

Yall ok? Do you need help?

168. Then the next day, February 20, 2026, Mr. Ackman sent a separate text message to defaming Plaintiffs, which was forwarded to Plaintiffs by the President of its client United Towing, Adnan Reguig. This time, Mr. Ackman specifically referred to the Plaintiffs and being associated with the "fake insurance" as shown below:

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

169. In fact, just days later, Mr. Ackman sought to capitalize on the fruits of his efforts by sending messages to Plaintiffs' clients in an attempt to use the defamatory and disparaging disclosures to steal Plaintiffs' customers.

170. There is no reason that Mr. Buchanan, Mr. Alkire, or Mr. Ackman should have any interest in or involvement Plaintiffs' brokering the sale of insurance to through the New Program. The reason those individuals and their respective employers continue to seek to harm Plaintiffs is driven purely by the desire to increase their own profits by systematically driving Plaintiffs out of the market, so that Plaintiffs' insureds will have no place to go except to Defendants. Such conduct is textbook market manipulation.

## O.  Plaintiffs have been significantly damaged.

171. Defendants' defamatory comments about Plaintiffs and other misconduct, including the interference and disruption of Plaintiffs' business, has caused MCIS significant financial losses, triggered disputes between MCIS and its clients, and with its clients' premium finance agencies, and permanently harmed MCIS's and Ms. Samarini's longstanding business reputation and standing in the industry, as well as with MCIS's clients. That misconduct also exposes MCIS's clients to existential risks of being uninsured or underinsured, harms which might ultimately lead to further exposure for MCIS.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**P.        Defendants' Misconduct effects interstate commerce.**

172.    Defendants' operations in the industry generally and specifically with respect to Plaintiffs' business operations effect interstate commerce.

173.    For example, Ryan Specialty acknowledged that its wholesale brokerage services are reach "insurance carriers with efficient variable-cost distribution in all 50 states through extensive relationships with retail brokers."

174.    Indeed, Ryan Specailty's interstate operations are directly implicated in the market consolidation discuss above. When discussing the potential future of "a reduced number of insurance carriers or retail brokers with which [Ryan Specialty] trade[s] or derive[s] a greater portion of our commissions and fees from a more concentrated number of insurance carriers [or] retail brokers," Ryan Specialty explained:

> Should our dependence on a smaller number of insurance carriers, retail brokers or other trading partners increase, whether as a result of the termination of relationships, consolidation or otherwise, we may become more vulnerable to adverse changes in our relationships with these counterparties, particularly in states where we offer insurance products from a relatively small number of insurance carriers or where a small number of insurance companies or retail brokers dominate a geographic area, lines of business, or market segment.

*See* Ryan Specialty 10-K.

175.    As a result, Ryan Specialty's role in consolidating the market directly impacts interstate commerce because of its impact on insurance carriers and brokers spanning multiple, if not all, states.

176.    Moreover, Ryan Specialty's use of its digital marketplace, RT Connector, also allows it to transact its business online across state lines specifically allowing its "retail clients and internal producers [to] receive quotes and bind policies online."

177.    Ryan Specialty's quoting and binding of policies online also effects interstate commerce through its dissemination of products and services via the internet.

178.    There is also no doubt that MCIS's and Ryan Specialty's business relationship itself effects interstate commerce. The Producer Agreement establishes MCIS as part of Ryan Specialty's wholesale distribution network that is national in

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 30 –

COMPLAINT

scope and expressly implicates services and products provided by Ryan Specialty affiliates and subsidiaries located in California, Delaware, Florida, and New York.

179. Accordingly, any statements made in connection with the business relationships between insureds, brokers, MGAs, and/or carriers born out of the Producer Agreement effects interstate commerce.

180. Indeed, outside of Ryan Specialty's interstate operations, the same defamatory and false statements described herein have impacted wholesale insurance activities, products, and services offered by Plaintiffs other Defendants who operate and conduct business in at least the following states: Alabama, California, Florida, Utah, and New York.

## FIRST CAUSE OF ACTION

### Breach of Contract

(MCIS Against Defendant Ryan Specialty)

181. Plaintiffs incorporate the proceeding paragraphs as though fully set forth herein.

182. On or about July 8, 2022, Ryan Specialty and MCIS entered into the Producer Agreement.

183. Under the Producer Agreement, the Ryan Specialty entities earned commissions and fees from insurance policies placed by MCIS through Ryan Specalty's insurance products and solutions. *See* Producer Agreement § 5.01.

184. The Producer Agreement "may be terminated by [either party] for any reason by written or electronic notice to the other Party stating when such termination is to be effective." *Id.* § 9.01.

185. Ryan Specialty breached the Producer Agreement by terminating MCIS without providing any notice to MCIS, leaving MCIS to learn about its apparent termination ***after*** it submitted an application for insurance on behalf of MCIS's client in or around March 27, 2025.

186. Ryan Specialty also breached in the implied duty of good faith and fair

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

dealing when improperly terminating the Producer agreement because that termination: (i) was premised on a bad faith and retaliatory exercise of discretion, and (ii) deprived MCIS of the benefit of its bargain through which MCIS agreed to allow Ryan Specialty to use MCIS's data and that of its client-insureds to develop Ryan Specialty's insurance products with the expectation of a *mutually* beneficial improvement of the overall efficiency of the insurance business, a benefit which MCIS was cut off from by the termination of the Producer Agreement even though that benefit was maintained by Ryan Specialty.

187.    The Producer Agreement further provides that Ryan Specialty "agreed to indemnify, defend and hold harmless [MCIS], its officers, directors, and employees from any and all losses, liabilities, suits, claims, expenses, reasonable attorneys' fees, penalties or fines arising from the acts, errors or omissions of the Providers, ***whether intentional or unintentional***. This Section 10.02 will survive the termination of this Agreement." Producer Agreement § 10.02 (emphasis added).

188.    Ryan Specialty breached the Producer Agreement by failing to indemnify and hold MCIS harmless against the numerous losses, liability, claims, expenses, and reasonable attorneys' fees and costs described in this complaint, all of which arising from the intentional and unintentional acts of Ryan Specialty.

189.    As a direct and proximate cause of Ryan Specialty's breaches of the Producer Agreement, Plaintiffs suffered damages in an amount to be determined at trial, including without limitation loss of revenue from placement of insurance products, and all other losses described in this complaint (including without limitation MCIS's attorneys' fees and costs) arising out of Ryan Specialty's intentional or unintentional acts.

## SECOND CAUSE OF ACTION

### Defamation

(Plaintiffs against All Defendants)

190.    Plaintiffs incorporate the proceeding paragraphs as though fully set forth

herein.

191.    This cause of action seeks relief under theories of defamation *per se* as well as defamation *per quod*.

192.    Plaintiffs were harmed by Defendants, or their agents, making several statements, including but limited to statements that: indicated that Ms. Samarini was not to be trusted; that Plaintiffs had issued fraudulent insurance documents; Plaintiffs were engaged in brokering the sale of fraudulent or fake insurance; and that Plaintiffs were a fraud.

193.    Defendants made one or more of these statements to a person or persons other than Plaintiffs.

194.    The persons or persons who received Defendants' statements reasonably understood that the statements were about Plaintiffs.

195.    The statements made by Defendants were false.

196.    Because the false statements impute that Plaintiffs were unable to perform their duties and lacked integrity in doing so, and otherwise prejudiced Plaintiffs in their profession, the defamation constitutes defamation *per se*.

197.    The false statements giving rise to this claim include at least the following, as well as others as may be revealed during discovery in this matter:

    i.    Mr. Buchanan's false statements described in paragraphs 129, 130, 132, 133, 135, 140, 145, 160.   Because Mr. Buchanan was at all times working on behalf of, and in his capacity as an officer and employee of Ryan Specialty, Ryan Specialty is vicariously liable for all such conduct by Mr. Buchanan.  Further, because Mr. Buchanan was an express agent of Navigators at the time of his campaign of defamation against Plaintiffs, Navigators is also vicariously liable for all misconduct by Mr. Buchanan.

    ii.    Mr. Alkire' false statements described in paragraphs 158 and 164.

    iii.    Mr. Ackman's false statements described in paragraphs 152, 154.

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Because Mr. Ackman was at all times working on behalf of, and in his capacity as an employee of either Rubin Insurance Agency (which itself was an agent of Trucordia) or Trucordia, both Rubin Insurance Agency and Trucordia are vicariously liable for all such conduct by Mr. Ackman.

198. Because the false statements impute that Plaintiffs were unable to perform their duties and/or lacked integrity in doing so, and otherwise prejudiced and injured Plaintiffs in respect of their profession, the defamation constitutes defamation *per se*.

199. As a direct and proximate cause of Defendants' publication of the false statements, Plaintiffs suffered damages in an amount to be determined at trial, that include but are not limited to, the harm suffered to Plaintiffs' reputations, Plaintiffs' losses to their business, trade, property, profession, and Plaintiffs' shame, mortification, or hurt feelings, and punitive damages.

## THIRD CAUSE OF ACTION

### Intentional Interference with Contractual Relations

(Against All Defendants)

200. Plaintiffs incorporate the proceeding paragraphs as though fully set forth herein.

201. As part of its regular course of business, Plaintiffs entered into contracts with its clients to help facilitate the clients' insurance needs, including binding insurance agreements and premium finance agreements (collectively, "Client Contracts"). Plaintiffs also entered in producer agreements with wholesale brokers such as CRC/5Star, RPS, and STR (collectively, the "Broker Agreements").

202. Defendants or their agents intentionally interfered with the Client Contracts and/or Broker Agreements (collectively, "Plaintiffs' Contracts").

203. Defendants were aware of Plaintiffs' business practices and the customary business practices in the industry, and thus, Defendants knew that Plaintiffs entered into the Plaintiffs' Contracts.

– 34 –

COMPLAINT

204. Defendants' misconduct more fully described herein, including but not limited to making false and defamatory statements about Plaintiffs, prevented Plaintiffs from finding insurance policies that suitably covered its clients' needs, made the insurance coverage more expensive or difficult of Plaintiffs' clients, resulted in termination of certain of Plaintiffs' Contracts, and otherwise inhibited Plaintiffs from realizing the benefit of the bargains struck when entering the Plaintiffs' Contracts.

205. Defendants intended to disrupt Plaintiffs' performance of the Plaintiffs' Contracts.

206. Because Mr. Buchanan was at all times working on behalf of, and in his capacity as an officer and employee of Ryan Specialty, Ryan Specialty is vicariously liable for all such conduct by Mr. Buchanan that constitutes intentional interference with contractual relationships. Further, because Mr. Buchanan was an express agent of Navigators at the time of his campaign of defamation against Plaintiffs, Navigators is also vicariously liable for all such misconduct by Mr. Buchanan.

207. Because Mr. Ackman was at all times working on behalf of, and in his capacity as an employee of either Rubin Insurance Agency (which itself was an agent of Trucordia) or Trucordia, both Rubin Insurance Agency and Trucordia are also vicariously liable for all such conduct by Mr. Ackman.

208. As a direct and proximate cause of Defendants' interference with Plaintiffs' contracts with Plaintiffs' clients, Plaintiffs suffered damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**Intentional Interference with Prospective Economic Relations**

(Against All Defendants)

209. Plaintiffs incorporate the proceeding paragraphs as though fully set forth herein.

210. Defendants or their agents intentionally interfered with an economic relationship between Plaintiffs and Plaintiffs' clients that would have resulted in an

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

economic benefit to Plaintiffs, including but not limited to the commissions and fees from the policies.

211. Defendants or their agents intentionally interfered with an economic relationship between Plaintiffs and other insurers and MGAs that would have resulted in an economic benefit to Plaintiffs, including but not limited to the commissions and fees paid from the policies placed with those entities.

212. Defendants knew or should have known that Plaintiffs were in economic relationships with Plaintiffs' clients and other MGAs/insurers.

213. Defendants' misconduct more fully described herein, including but not limited to making false and defamatory statements about Plaintiffs, prevented Plaintiffs from finding insurance policies that suitably covered its clients' needs, made the insurance coverage more expensive or difficult of Plaintiffs' clients, resulted in termination of certain of Plaintiffs' Contracts, and otherwise inhibited Plaintiffs from realizing the benefit of the bargains struck when entering the Plaintiffs' Contracts.

214. By making the false and defamatory statements about Plaintiffs, Defendants intended to disrupt the economic relationship between Plaintiffs and Plaintiffs' clients or knew that disruption of the relationships were certain or substantially certain to occur.

215. Because Mr. Buchanan was at all times working on behalf of, and in his capacity as an officer and employee of Ryan Specialty, Ryan Specialty is vicariously liable for all conduct by Mr. Buchanan that constitutes intentionally interfered with the economic relationships between Plaintiffs and Plaintiffs' clients. Further, because Mr. Buchanan was an express agent of Navigators at the time of his campaign of defamation against Plaintiffs, Navigators is also vicariously liable for all such misconduct by Mr. Buchanan.

216. Because Mr. Ackman was at all times working on behalf of, and in his capacity as an employee of either Rubin Insurance Agency (which itself was an agent of Trucordia) or Trucordia, both Rubin Insurance Agency and Trucordia are also

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 36 –

COMPLAINT

vicariously liable for all such conduct by Mr. Ackman.

217. As a direct and proximate cause of Defendants' interference with Plaintiffs' economic relationships with Plaintiffs' clients, Plaintiffs suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Violation of False Advertising Law

Cal. Bus. & Prof. Code § 17500 *et seq*.

(Against All Defendants)

218. Plaintiffs incorporate the proceeding paragraphs as though fully set forth herein.

219. Defendants' conduct violates California's FAL, codified as Cal. Bus. & Prof. Code § 17500 *et seq*., which prohibits making or disseminating false or misleading statements in or from California.

220. Plaintiffs have standing to bring this claim because they suffered economic harm and lost fees earned from commission due to Defendants' or their agents' false advertising.

221. Defendants' false and misleading statements regarding Plaintiffs which are described above violate California's False Advertising Law because, upon information and belief, they were either disseminated from California or disseminated to the public in California.

222. These statements were likely to deceive the members of the public because they came from individuals who were prominent in the E&S industry. The individuals receiving Defendants' false statements had no reason to believe the false statements from Defendants were indeed false.

223. Defendants knew or should have known that the statements were false and misleading.

224. Because Mr. Buchanan was at all times working on behalf of, and in his capacity as an officer and employee of Ryan Specialty, Ryan Specialty is vicariously

– 37 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

liable for all conduct by Mr. Buchanan that constitutes false advertising. Further, because Mr. Buchanan was an express agent of Navigators at the time of his campaign of defamation against Plaintiffs, Navigators is also vicariously liable for all such misconduct by Mr. Buchanan.

225. Because Mr. Ackman was at all times working on behalf of, and in his capacity as an employee of either Rubin Insurance Agency (which itself was an agent of Trucordia) or Trucordia, both Rubin Insurance Agency and Trucordia are also vicariously liable for all such conduct by Mr. Ackman.

226. As a direct and proximate cause of Defendants' false and misleading statements Plaintiffs suffered damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

### Violation of California Unfair Competition Law

Cal. Bus. & Prof. Code § 17200 *et seq.*

(Against All Defendants)

227. Plaintiffs incorporate the proceeding paragraphs as though fully set forth herein.

228. Defendants' conduct violates California's UCL, codified as Cal. Bus. & Prof. Code § 17200 *et seq.*, which prohibits unlawful, unfair, or fraudulent business acts or practices.

229. Plaintiffs have standing to bring this claim because they suffered economic harm and lost fees earned from commission due to Defendants' or their agents' unfair competition.

230. Defendants' conduct was unlawful because Defendants made false representations in violation of 15 U.S.C. § 1125(a) (the Lanham Act); made false representations in violation of the FAL (Cal. Bus. & Prof. Code § 17500 *et seq.*); made defamatory statements in violation of common law; and engaged in otherwise tortious conduct as described fully herein in violation of California common law.

231. For these reasons stated herein, Defendants' conduct is also unfair under

– 38 –
COMPLAINT

the UCL. Defendants' conduct is additionally unfair because of Defendants' tortious interference, false advertising, and defamation were aimed at harming Plaintiffs' ability to compete in the E&S market.

232. Defendants' conduct is fraudulent under the UCL because Defendants represented to Plaintiffs' customers and competitors that Plaintiffs were not trustworthy in order to undercut Plaintiffs' position in the E&S Market.

233. As a direct and proximate cause of Defendants' unlawful, unfair, and fraudulent conduct, Plaintiffs suffered damages in an amount to be determined at trial.

234. Absent injunctive relief, Plaintiffs will continue to suffer monetary and reputational harm.

### SEVENTH CAUSE OF ACTION

### CONSPIRACY

(Against All Defendants)

235. Plaintiffs incorporate the proceeding paragraphs as though fully set forth herein.

236. Plaintiffs were harmed by Defendants' misconduct more fully described herein and each Defendant, or its agents, were part of the conspiracy to commit the defamation.

237. Each Defendant, or its agents, planned to defame Plaintiffs.

238. Each Defendant, or its agents, agreed with the other Defendants and intended to defame Plaintiffs, and worked together to do so by taking one or more steps in furtherance of the conspiracy.

239. As a direct and proximate cause of Defendants' conspiracy to defame, Plaintiffs suffered damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION

### FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(a)

(Against All Defendants)

240. Plaintiffs incorporate the proceeding paragraphs as though fully set forth

– 39 –

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

herein.

241.    The defamatory and false statements described herein constitute both formal and informal commercial promotion by Defendants and are material in that they are likely to influence the public and E&S industry members' decision to purchase Plaintiffs' insurance brokerage services and products.

242.    As set forth above, these statements were disseminated to multiple players at every level of the E&S market to promote business, commissions, and fees away from Plaintiffs to other brokers.

243.    As set forth above, Defendants, on or in connection with goods, products, and services it distributes in interstate commerce, has made and is continuing to make false and/or misleading statements concerning the legitimacy of Plaintiffs' insurance brokerage activities, services, and products, including but not limited to the false states detailed herein. These statements constitute false description of fact or false representations of fact as to the inherent nature, characteristics, and qualities of Plaintiffs' insurance brokerage activities, services, and products.

244.    Defendants' false and/or misleading advertising are of such a material nature that they have tendency to deceive a substantial portion of customers, consumers, and members of the E&S market as to the legitimacy of Plaintiffs' insurance brokerage activities, services, and products compared to other retail brokers in the industry.

245.    Defendants' false representations of fact were made in commercial advertising and/or commercial promotions and have deceived a substantial segment of the E&S market and has directly influenced the purchasing decisions by multiple individuals and entities who operate in the E&S market.

246.    Defendants caused the false and/or misleading statements to enter interstate commerce by way of established wholes insurance distributions chains that are national in scope.

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

247.   Plaintiffs have been injured as a result of the false and/or misleading statements both through the direct diversion of sales from Plaintiffs and by the lessening of the goodwill associated with Plaintiffs' products and services.

248.   The foregoing acts of Defendants constitute false descriptions or representations of fact in commercial advertising and/or promotion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

249.   Moreover, Defendants will unjustly reap profits from commissions, fees, and other sales based on consumer and industry reliance on Defendants' false and deceptive statements of fact regarding Plaintiffs' insurance brokerage activities, services, and products.

250.   Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to actual damages in an amount to be determined at trial, to have such damages trebled, to Defendants' profits, to the costs of this action, and to attorneys' fees.

## NINTH CAUSE OF ACTION

## NEGLIGENT SUPERVISION, HIRING, AND RETENTION

(Against Ryan Specialty)

251.   Plaintiffs incorporate the proceeding paragraphs as though fully set forth herein.

252.   Defendant Ryan Specialty hired and retained the employment of Mr. Buchanan while Ryan Specialty knew, or should have known, that he is unfit to act as the Vice President of Transportation.

253.   Mr. Buchanan spread false statements regarding the Plaintiffs while acting within the scope of his employment as set forth above.

254.   Ryan Specialty had reason to know of these false statements as, upon information and belief, a number of them were made using Mr. Buchanan's company email.

255.   Moreover, as explained above, on March 11, 2025, Counsel for Plaintiffs sent the Cease and Desist letter to Ryan Specialty addressed both to CEO Timothy W.

– 41 –

Turner and Mr. Buchanan.  Among other things, that Cease and Desist Letter demanded that Ryan Specialty and Mr. Buchanan immediately cease and desist from spreading further unsubstantiated and false allegations about fraud, misrepresentations, or other misconduct regarding MCIS and/or Ms. Samarini.  Therefore, Ryan Specialty had express knowledge of Mr. Buchanan's false statements and other improper conduct.

256.  Ryan Specialty breached its duty to supervise Mr. Buchanan as, upon information and belief, it did nothing to stop or prevent Mr. Buchanan's misconduct after receiving the Cease and Desist.

257.  These false statements created danger for those in the industry and the general public as Plaintiffs' clients were confused and misled by the statements.

258.  Moreover, as a result of Mr. Buchanan's false statements, 5Star improperly issued notices of cancelation for numerous policies placed by MCIS through 5Star.  This inherently is dangerous for society at large as it left the clients who operate in the transportation industry uninsured.

259.  Ryan Specialty's decision to hire and retain Mr. Buchanan—who was unfit for his position—and Ryan Specialty's failure to supervise Mr. Buchanan after receiving the Cease and Desist letter caused harm to Plaintiffs because his false statements caused confusion among Plaintiffs' customers, harmed Plaintiffs' business relationships with their clients, and ultimately resulted in lost business opportunities.

260.  As a direct and proximate cause of Ryan Specialty's negligent supervision, hiring, and retention, Plaintiffs suffered damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Compensatory damages in an amount to be proven at trial;

2.    Punitive damages;

3.    Injunctive relief;

4.    Restitution;

– 42 –

COMPLAINT

5.    Attorneys' fees;

6.    Treble damages;

7.    Defendants' gains, profits, savings as a result of their false advertising and unfair competition;

8.    Plaintiffs' costs of suit incurred;

9.    Prejudgment interest at the maximum rate permitted by law;

10.    A declaration that this is an "exceptional case" due to the willful nature of Defendants' false advertising, and awarding attorneys' fees, costs, and expenses to Plaintiffs pursuant to 15 U.S.C. § 1117; and

11.    For such other or further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.


Dated: March 2, 2026                     Respectfully submitted,
                                         REED SMITH LLP

                                         By: /s/ *Olivia M. Treister*
                                         Mark W. Fidanza
                                         Timothy J. Muyano
                                         Olivia M. Treister

                                         *Attorneys for Plaintiffs*
                                         Lolita Samarini and Manatek Commercial
                                         Insurance Services, Inc.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COMPLAINT

# EXHIBIT A



## NATIONAL PRODUCER AGREEMENT

This National Producer Agreement (this "Agreement") is by and between Ryan Services Group, LLC (in California, d/b/a RSG Marketing Insurance Services, LLC, and in Nebraska and Oklahoma, d/b/a RSG Insurance Services, LLC), a Delaware limited liability company (hereinafter "RSG"), for and on behalf of itself and the Providers (as defined below), and the producer identified on the signature page to this Agreement (the "Producer").

### Background Recitals

RSG is a subsidiary of Ryan Specialty Group, LLC ("Ryan"), and provides marketing services on behalf of subsidiaries and affiliates of Ryan. Subsidiaries and affiliates of Ryan operate as wholesale insurance brokerage and underwriting management intermediaries offering specialized insurance products and services to independent agents and brokers for their customers and clients.

The underwriting management services of Ryan are provided by RSG Underwriting Managers, LLC (in California and Nevada, *d/b/a* RSG Insurance Services, LLC), a Delaware series limited liability company (hereinafter, "RSGUM"), and its series companies and subsidiaries. As used in this Agreement, RSGUM, together with its series companies and subsidiaries organized or acquired by Ryan that operate as underwriting management intermediaries will be referred to as "RSGUM Providers."

The wholesale insurance brokerage services of Ryan are provided by R-T Specialty, LLC (in California and New York, *d/b/a* R-T Specialty Insurance Services, LLC, and in Florida, d/b/a R-T Specialty of Florida, LLC), a Delaware limited liability company (hereinafter "RT").  As used in this Agreement, RT and all of its existing subsidiaries, together with any subsidiary organized or acquired by RT after the Effective Date will be referred to as "RT Providers."

From time to time, RSG, or its subsidiaries or affiliates, may organize or acquire other insurance intermediaries offering specialized insurance products, or underwriting management and claims services on behalf of one or more specified insurers, to insurance agents, producers, and brokers for their customers and clients. All current and future insurance intermediaries organized or acquired by or on behalf of RSG, the RT Providers, or the RSGUM Providers will be referred to separately, as "Provider" and, collectively, the "Providers." RSG, the Providers and the Producer may hereinafter be referred to individually as a "Party."

The Producer is an insurance agent, producer, or broker that wishes to obtain through one or more of the Providers certain specialty insurance products for and on behalf of its customers and clients. The Producer intends for this Agreement to extend to, govern and include all of the Producer's branch office locations, subsidiaries, affiliates and Federal Employer Identification Number(s) indicated on the Producer information table at the end of this Agreement or attached as a schedule hereto.

The Producer, RSG, and the Providers want to mutually benefit and improve the overall efficiency of the insurance business which the Producer and the Providers may conduct by eliminating the need for the Producer to execute a separate broker, agency, or producer agreement with each Provider or each branch office location, subsidiary or affiliate which operates under the same Federal Employer Identification Number with whom the Producer and any Provider intend to conduct business.

Exhibit A - Page 44

**The Agreement**

RSG, for itself and on behalf of the Providers, and the Producer, intending to be legally bound, agree as follows:

**1.    RSG Representations and Warranties**

1.01    RSG represents and warrants that it is authorized to enter into this Agreement and shall be bound by the terms hereof, and that each Provider (i) has authorized RSG to execute this Agreement on its behalf, (ii) is and will be bound to the Producer by the terms of this Agreement as if it was a signatory hereto, (iii) the Producer's covenants and undertakings to RSG are and will be deemed to be the Producer's covenants and undertakings to the Providers, and (iv) documents, records, or other information the Producer provides to RSG will be deemed to be documents, records, or other information the Producer provides to the applicable Provider.

1.02    RSG represents and warrants that each Provider possesses all requisite (i) resident corporate, agency, and/or individual agent, broker, producer, surplus lines or other license required by the insurance regulator in the state in which it was incorporated or organized (the "Provider Domicile State") in order to transact the insurance business contemplated under this Agreement, and (ii) non-resident corporate, agency, and/or individual agent, broker, producer, surplus lines or other license required by any applicable non-Provider Domicile State insurance regulator in order to transact the insurance business contemplated under this Agreement, including but not limited to any license applicable to the Provider in the home state of the named insured under any applicable insurance policy; *provided*, that the home state will be determined in accordance with the provisions of the Nonadmitted and Reinsurance Reform Act of 2010, 15. U.S.C. §8201, *etc.* ("NRRA") where applicable.

1.03    Except to the extent that RSG notifies the Producer in writing to the contrary, RSG represents and warrants that any Provider that is organized or acquired after the effective date of this Agreement (i) will be bound to the Producer by the terms of this Agreement as if it was a signatory hereto and has authorized RSG to so notify the Producer, (ii) will authorize and agree that the Producer's covenants and undertakings to RSG will be deemed to be the Producer's covenants and undertakings to such Provider, and (iii) any licenses, proof of insurance or documents, records, or information other than policyholder submissions, that the Producer provides to RSG will be deemed to be documents, records, or other information the Producer provides to any such Provider.

1.04    RSG will notify the Producer of any subsequently acquired or organized Providers, and such notification may include written or electronic correspondence to the Producer or postings on its website or one or more of the websites of the RT Providers or the RSGUM Providers, each of which will constitute adequate and effective notice under this Section 1.04.  Producers are responsible for monitoring the websites of RSG, the RT Providers and the RSGUM Providers for such notices.

**2.    Producer Representations and Warranties**

2.01    The Producer represents and warrants that it is authorized to enter into this Agreement on behalf of itself and all subsidiaries and affiliates operating under this Agreement, and each shall be bound by the terms hereof as if it was a signatory hereto. The Producer also represents and warrants that it and all persons acting on its behalf or at its direction possess all requisite (i) resident corporate, agency, and/or individual agent, broker, producer, surplus lines or other license required by the insurance regulator in the state in which it was incorporated or organized (the "Producer Domicile State") in order to transact the insurance business contemplated under this Agreement, and (ii) non-resident corporate, agency, and/or individual agent, broker, producer, surplus lines or other license required by any applicable non-Producer Domicile State insurance regulator in order to transact the insurance business contemplated under this Agreement, including but not

RYAN
SPECIALTY

Exhibit A - Page 45

limited to any license applicable to the Producer or any person(s) acting on its behalf or at its direction in the home state of the named insured under any applicable insurance policy; *provided that*, the home state will be determined in accordance with the provisions of the Nonadmitted and Reinsurance Reform Act of 2010, 15. U.S.C. §8201, *etc.* ("NRRA") where applicable.

2.02    The Producer represents and warrants that if the Producer asks RSG or any Provider to issue a quotation for any of the Producer's customers, clients, or prospects that are located outside the Producer Domicile State, the Producer and all persons acting on its behalf or at its direction shall have and maintain any non-resident corporate, and/or individual agent, broker, producer, surplus lines or other license required by any applicable insurance regulator in such state in connection with such quotation.

2.03    The Producer represents and warrants to RSG and the Providers that the Producer is and will be bound to the Providers with whom the Producer transacts business by the terms of this Agreement as if the Providers were signatories hereto.

2.04    The Producer represents and warrants that the Producer will not (i) bind RSG or any Provider, or any insurer with respect to any insurance, without the prior written authorization of the applicable Provider, (ii) issue any certificate of insurance that is inconsistent with the policy terms issued, or (iii) place any advertisement, in any medium currently existing or existing at any time during the term of this Agreement, or issue or distribute any circular or paper, involving RSG or any Provider, without the prior written consent of RSG or the applicable Provider, as the case may be.

2.05    All information submitted by Producer in conjunction with this Agreement and any products or services contemplated herein is true and correct, and Producer shall give RSG prompt notice of any change in such information.

**3.    Insurance Licenses**

3.01    Upon RSG's request, the Producer will promptly provide RSG with a copy of all resident and non-resident corporate, agency, and/or individual agent, broker, producer, surplus lines or other similar licenses held and maintained by the Producer.

3.02    Upon the Producer's request, RSG will promptly provide the Producer with a copy of all resident and non-resident corporate, agency, agent, broker, producer, surplus lines or other similar licenses held and maintained by any applicable Provider.

3.03    RSG will provide the Providers with access to, or evidence of, any or all resident or non-resident corporate, agency, insurance agent, broker, producer, surplus lines or other similar licenses or information the Producer provides to RSG, and the Producer will have no obligations to provide any such licenses or information to the Providers directly.

**4.    Errors and Omissions Insurance Coverage**

4.01    Upon RSG's request, the Producer will promptly provide RSG with evidence to RSG's reasonable satisfaction of errors and omissions insurance coverage in force that the Producer maintains for itself and its officers and employees, with an annual policy limit for each occurrence of not less than $1,000,000.

4.02    While policies issued under this Agreement are in effect, the Producer will continue to maintain in force errors and omissions insurance coverage for itself and its officers and employees, with an annual policy limit for each

**RYAN** SPECIALTY

Exhibit A - Page 46

occurrence of not less than $1,000,000, and upon RSG's request, will promptly provide RSG with evidence to RSG's reasonable satisfaction of such errors and omissions insurance coverage.

4.03     For purposes of Sections 4.01 and 4.02, the Producer's compliance with any Provider's request also will be deemed to be compliance with, and for the benefit of, all the Providers.

4.04     All errors and omissions insurance coverage contemplated under this Section 4 will be issued by insurers with an A.M. Best rating of equal to or greater than A-.VII.

**5.     Compensation; Collection and Payment of Premiums and Surplus Lines Taxes and Fees**

5.01     All compensation payable by any Provider to the Producer for business the Producer places with such Provider will be in such amount or percentage of premium charged for such business as indicated on any invoice or statements issued by the Provider, or as the Producer and such Provider otherwise mutually agree in writing. If there is return premium with respect to any business the Producer places with any Provider hereunder, the Producer will pay return commission at the same rate or on the same basis upon which such business was placed.

5.02     The Producer will pay any Provider with whom the Producer has placed insurance business hereunder the balance due on all certificates, policies, and endorsements relating to such business at the time indicated on any invoice or statement issued by the Provider, or as the Provider and the Producer otherwise mutually agree in writing. Producer agrees to comply with all applicable laws and regulations related to disclosure of compensation, including, if applicable, disclosure of potential incentive or contingent compensation and the criteria for receiving such compensation. Producer agrees to disclose in writing to each customer or client in advance of purchase the nature of any compensation Producer will receive or may be eligible to receive from Provider in connection with the placement or servicing of the customer's or client's business, including Producer's potential eligibility to receive incentive or contingent compensation. Producer agrees to provide a copy of such disclosures to Providers upon request.   Producer will also notify the customer or client that the customer or client may obtain more information about the compensation Producer receives or is eligible to receive in connection with the placement or servicing of the customer's or client's business, and Producer will provide to the customer or client any compensation disclosure requested by the customer or client, or any disclosure required by RSG or the Providers. If required by law or requested by the customer or client, Provider may disclose the compensation paid to Producer by Provider or for which Producer may be eligible.

5.03     A Provider with whom the Producer has placed insurance business may also have an agreement with the insurer that may pay Provider future additional incentive or other compensation.  This type of compensation is in addition to any fees and/or commissions that Provider has agreed to accept for placing the insurance.  This compensation could be based on formulas that consider the volume of business placed with the insurer, the profitability of that business, how much of the business is retained for the insurer's account each year, and potentially other factors.  The agreements frequently consider total eligible premium from all clients placed during a calendar year and any incentive or contingent compensation is often received at a future date, including potentially after the end of the following calendar year.  Because of variables in these agreements, Providers often have no accurate way at the time of placement to determine the amount of any additional compensation that might be attributable to the insurance placed.  RSG affiliates may also earn investment income on accounts temporarily held as fiduciary funds and compensation as a broker, underwriting manager, reinsurance intermediary, premium finance company, claims adjuster, consultant or service provider.  If you need additional information about the compensation arrangements for services provided by RSG affiliates, please contact your RSG representative.  The broker with the direct relationship with the customer or client must comply with all applicable laws and regulations related to disclosure of compensation, including disclosure of potential incentive or contingent compensation and the criteria for receiving such compensation, and informing the customer or client that it may request more information about producer or broker compensation that might be paid in connection with the customer's or client's placement.

**RYAN** SPECIALTY

5.04     Subject to Section 5.05, the Producer guarantees to pay the applicable Provider all premiums, and taxes if applicable, on any insurance policy placed or arranged by such Provider for the Producer, irrespective of whether the Producer has collected such premiums, or taxes if applicable, from any customer or client of the Producer. This Section 5.04 will survive the termination of this Agreement.

5.05     Notwithstanding Section 5.04, the Producer will not be responsible for any disputed or uncollectible additional premium due pursuant to any annual or interim premium audit or any retrospective rating adjustment under any insurance policy placed or arranged by the Provider for the Producer, *provided that*, the Producer notifies the Provider of the Producer's inability, following the Producer's diligent efforts, to collect such additional premium within 30 days,  or any other due date stated in the invoice, after the Producer receives written notice from the Provider of such additional premium.  The Producer will not be entitled to any compensation with respect to any such additional premium, irrespective of whether such premium is collected from the applicable customer or client. The Producer shall not accept payments for any audits past the due date without prior written approval from Providers. This Section 5.05 will survive the termination of this Agreement.

5.06     Any premiums the Producer collects or receives from its customer or client for insurance placed hereunder, and any premium refunds that are paid by or on behalf of any Provider to the Producer for the Producer's customer or client, must be deposited into one or more of the Producer's fiduciary accounts in accordance with all applicable insurance laws and regulations until they are due to be paid to the Provider or such customer or client, as the case may be. Subject to any applicable insurance laws or regulations and any applicable insurer's consent, if required, the interest or investment income earned while any such premiums are on deposit in any such accounts may be retained.

5.07     Upon RSG's or any Provider's request, the Producer will promptly provide RSG or the applicable Provider with evidence to RSG's or the Provider's reasonable satisfaction of the Producer's compliance with its obligations under Section 5.06, and the Producer's compliance with RSG's request also will be deemed to be compliance with, and for the benefit of, all Providers applicable to the business written.

5.08     If any business placed by the Producer with an RT Provider is underwritten by a non-admitted insurer in the state where such business is written, the applicable RT Provider will be responsible for timely compliance with all applicable surplus lines requirements governing such business, including without limitation (i) filing and retaining documentation of the requisite declinations from admitted insurers, and (ii) filing, and paying all requisite taxes and fees applicable to such business; *provided that*, the Producer shall cooperate with the RT Provider to collect all required documentation and taxes or fees reasonably requested by the RT Provider to satisfy its obligations hereunder. If any business placed by the Producer with a RSGUM Provider is underwritten by a non-admitted insurer in the state where such business is written, the Producer will be responsible for timely compliance with all applicable surplus lines requirements governing such business, including without limitation (i) procuring and documenting requisite declinations from admitted insurers, and (ii) collecting, filing, and paying all requisite taxes and fees applicable to such business. For such business placed by the Producer with any Provider on a non-admitted basis, upon request, the Producer shall provide the applicable Provider with proof of such compliance with and filing of the applicable surplus lines taxes and requirements. Any exception to this Section 5.08 will be as the applicable Provider and the Producer mutually agree in writing.

5.09     If the Producer does not pay the premiums, and taxes if applicable, described in Section 5.04 above when due, and as a result of such non-payment, any Provider incurs any damage, cost, fine, penalty, or expense, including, but not limited to, collection expense and reasonable attorneys' fees, the Producer will promptly reimburse the Provider for any such damage, cost, fine, penalty, or expense, including, but not limited to, collection expense and reasonable attorneys' fees, with respect to such unpaid premiums and any applicable taxes. This Section 5.09 will survive the termination of this Agreement.

RYAN
SPECIALTY

Exhibit A - Page 48

**6.      No Automatic Renewals; Notice of Policy Expirations**

6.01      Insurance placed or arranged by any Provider for the Producer will be for a definite policy period, as specified in the applicable policy. RSG and the Provider will not be obligated to notify the Producer about any policy's expiration, and the Producer will be responsible for notifying its customers and clients about any such expiration.

6.02      The Producer will be responsible for complying with all renewal notice requirements regardless of any prior practice of the Provider, or any industry standard, custom, or usage. Notwithstanding the immediately preceding sentence, if the Provider, in its sole discretion, voluntarily notifies the Producer about any policy expiration or renewal requirements, such notification will not be deemed under this Section 6.02 to be a waiver of the Producer's responsibilities for all other insurance placed or arranged by any Provider for the Producer, and the Provider may insist upon the Producer's compliance with this Section 6.02 in all other cases.

**7.      Compliance with Applicable Laws**

7.01      Producer agrees that RSG may verify Producer licenses through the National Insurance Producer Registry or similar licensing clearinghouse and conduct any background check deemed necessary on Producer, its owners, officers, directors or licensed producers. Producer will notify RSG at once if Producer's license necessary to operate under this Agreement is suspended, revoked or otherwise terminated, voluntarily or involuntarily, in any state or U.S. Territory. No commissions shall be due for any submission for which Producer is not properly licensed. If Producer fails to maintain the necessary licenses, Producer shall indemnify and hold harmless RSG and any Provider for any losses, claims, expenses, reasonable attorneys' fees, penalties or fines arising therefrom.

7.02      Producer agrees to comply with all insurance laws and regulations.  Producer will promptly notify RSG of any regulatory complaint, investigation, or alleged violation of law regarding any business produced under this Agreement.

7.03      Each Party shall comply with applicable laws regarding customer data or personal information ("PI") as such is defined in applicable privacy and data security laws and regulations ("Privacy & Data Laws") regulating the use, maintenance or disclosure thereof by the Parties' and their affiliates' employees, customers, policyholders or claimants.

**8.      Ownership of Expirations**

8.01      The Producer's records, together with the use, control, and ownership of expirations applicable to any insurance placed or arranged by or through Provider will remain the Producer's property, and such records and expirations will remain the property of the Producer even if there is a good faith dispute between the Producer and the Provider with respect to the accounting and/or payment of premiums, taxes if applicable, and other amounts due and owing.

**9.      Termination**

9.01      This Agreement may be terminated by RSG or the Producer for any reason by written or electronic notice to the other Party stating when such termination is to be effective; *provided, however*, that any such termination will not relieve the Producer's and any applicable Provider's obligations to each other with respect to payment of premium and taxes, if applicable, or compensation for insurance placed or arranged hereunder before the effective date of termination.

9.02      If RSG terminates this Agreement because the Producer does not pay any premium or taxes, if applicable, when due, any applicable Provider, at its option, may offset against such unpaid premium, or taxes if applicable, the amount

RYAN
SPECIALTY

Exhibit A - Page 49

of any future compensation otherwise payable to the Producer with respect to any insurance placed or arranged by the applicable Provider hereunder.

9.03    Termination of this Agreement will not affect any of the Producer's rights concerning the ownership of any insurance business, or expirations relating thereto, that any Provider placed or arranged hereunder for the Producer.

## 10.    Indemnification

10.01    Producer hereby agrees to indemnify, defend and hold harmless RSG, Ryan, the Providers and their officers, directors and employees from any and all losses, liabilities, suits, claims, expenses, reasonable attorneys' fees, penalties or fines, arising from the acts, errors or omissions, whether intentional or unintentional, of the Producer, its employees, representatives and sub-agents. This Section 10.01 will survive the termination of this Agreement.

10.02    Providers hereby agree to indemnify, defend and hold harmless the Producer, its officers, directors, and employees from any and all losses, liabilities, suits, claims, expenses, reasonable attorneys' fees, penalties or fines arising from the acts, errors or omissions of the Providers, whether intentional or unintentional. This Section 10.02 will survive the termination of this Agreement.

## 11.    Electronic Trading

11.01    During the term of this Agreement, and upon request of access to any RSG affiliate electronic trading sites ("Site" or "Sites"), RSG may provide to Producer a password to access and logon to the Site. Producer may not transfer or share its logon or password with anyone, except Producer may permit only its authorized agency employees to obtain and use the password and to access and use the content solely for the purpose of performing functions of daily business activity with RSG pursuant to this Agreement. Each user who uses the logon and password will be deemed to be authorized to access and use the Site by Producer, and RSG has no obligation to investigate the authorization or source of any such access or use. Producer solely will be responsible for all access to and use of the Site by anyone using the logon and password issued to Producer whether or not such access is actually authorized by Producer, including, without limitation, all communications, transmissions, transactions, and obligations (including, without limitation, financial obligations) that may result from such access or use. Producer will immediately notify RSG of any unauthorized use of the logon and password, any threatened or actual damage, hacking, security breach, or other unauthorized or illegal intrusion or use of the Site by any former or existing employee of Producer, or any other person. Producer shall hold the logon and password in strict confidence and shall not permit any use, disclosure, or distribution of such information to any person or entity except as expressly permitted under this Agreement. Producer's use, and the use by each user who uses Producer's logon and password, of the Site shall be subject to all terms and conditions of use posted on the Site, which are incorporated herein in their entirety by this reference, as the same may be amended from time to time, including, without limitation, any applicable liability disclaimer and limitation of liability. In addition to other indemnification obligations in this Agreement, Producer shall indemnify, defend, and hold harmless RSG's and it's affiliates' respective officers, directors, employees, agents, and customers from and against all claims, injury, liability, losses, expenses, damages and costs, including reasonable attorneys' fees, resulting, directly or indirectly, from any activity related to or arising from Producer's use of the Site, any of Producer's former or existing employee(s) use of the Site, and/or any use of the Site by any person using Producer's logon and password. RSG may, in its sole discretion, immediately suspend, terminate or refuse access to the Site and the related services or any portion thereof, or terminate Producer's logon and password, at any time, without notice, if RSG believes that Producer has transferred or shared its logon and password to the Site in violation of this Agreement or the terms and conditions of use posted on the Site, or Producer's use of the Site otherwise violates this Agreement, violates applicable law, or is harmful to the interests of RSG, its affiliates or their other customers.

RYAN
SPECIALTY

11.02    During the term of this Agreement, RSG hereby grants Producer a non-transferable, non-assignable and non-exclusive license to use and access the Site for its intended purpose. This Agreement authorizes access to the Site by Producer's employees who are acting in compliance with applicable producer licensing laws.  Producer must make the submission to the Site on behalf of the policyholder and no account may be "double brokered" from another producer without the written consent of RSG. The Producer must verify the product selected is suited to the policyholder's needs before binding. Premium refunds on policies cancelled may be delayed when it is necessary to issue a check.  Producer may use, copy and distribute RSG materials as presented on the Site and without alterations as long as each copy: (i) is solely for business transacted through RSG under this Agreement and is not modified or altered in any manner other than providing policyholder responses on insurance applications; (ii) plainly displays all copyright and other proprietary notices in the same manner as the original; and (iii) displays a statement that the materials are used solely with permission from RSG. Except as expressly provided herein, Producer shall not modify, publish, reproduce, republish, create derivate works, copy, upload, post, transmit, distribute, or otherwise use the Site's content or frame the Site within any other web site without obtaining prior written permission from RSG. Producer may not directly access a Site or any underlying database thereof except via the standard browser/graphic user interface for such Site.  Producer may not directly or indirectly (and Producer hereby covenants not to directly or indirectly) use any robot, script, or other automated tool to access or use a Site or any data or database thereof. Systematic retrieval of data or other content from the Site to create or compile, directly or indirectly, a collection, compilation, database or directory, without the prior written permission from RSG is prohibited.

11.03    Each Party agrees to maintain information security policies and procedures that include administrative, technical and physical safeguards designed to (i) ensure the security of customer data and PI, (ii) protect against anticipated threats or hazards to the security or integrity of customer data or PI, (iii) protect against unauthorized access or use of customer data or PI, (iv) comply with all applicable Privacy & Data Laws in its use of customer data or PI, and (v) return all customer data or PI to the disclosing Party, upon its request, or ensure the proper disposal of customer data or PI ("Security Procedures"). If required by applicable law, each Party shall conduct a risk assessment to evaluate the adequacy of their Security Procedures and adopt policies in response to the risk assessment including but not limited to, access controls, multi-factor authentication, and use of encryption to protect customer data and PI. Each Party further agrees to immediately notify the other Party of any actual or suspected breach of Security Procedures and/or data breach involving customer data or PI disclosed under this Agreement and to appropriately document any and all corrective actions taken. Upon learning of any security event involving data provided in connection with this Agreement each Party shall: (a) promptly, at its own cost and expense, conduct its own internal investigation; (b) cooperate with the other Party in any investigation of a security event; (c) comply with Privacy & Data Laws. All statements, releases, notices or communication of a security event involving the other Party's data or facilities require the written approval of that Party, said approval to be timely provided and not unreasonably withheld. Each Party will promptly exchange with the other Party any complaints from insureds, prospects or other members of the public or any governmental agency regarding the performance or operation of the Site under this Agreement. Producer will require from its third-party contractors who have access to the Parties' customer data or PI an Agreement that requires compliance with the data protection laws and protection of any customer data or PI received in connection with this Agreement. With respect to PI, the Parties shall, to the extent required by applicable Privacy & Data Laws, carry out the instructions of the identified or identifiable natural living person to whom the PI relates ("Data Subject") regarding access to their data, correction of inaccuracies in their data, erasing their data, prevention of direct marketing, automated decision-making and profiling with their data, and the portability of their data (safely moving personal data from one IT environment to another). The Producer shall immediately inform the Data Subject if, in its opinion, an instruction infringes Privacy & Data Laws.

11.04    RSG may use PI and other information received in conjunction with this Agreement or the use of Sites to create non-identifiable information that RSG may use alone or in the aggregate with information obtained from other sources, in order to help RSG to optimally deliver existing products and services or develop new products and services. Additionally, RSG may use PI and other information about insureds, prospective insured and Producers to create

**RYAN** SPECIALTY

Exhibit A - Page 51

anonymized and aggregated information, such as de-identified demographic information, de-identified location information, information about the computer or device from which a person accesses the Sites, or other analyses RSG creates. Anonymized and aggregated information is used for a variety of functions, including the measurement of visitors' interest in and use of various portions or features of the Site. Anonymized or aggregated information is not PI, and RSG may use such information in a number of ways, including research, internal analysis, analytics, and any other legally permissible purposes. RSG may share this information within RSG and with third parties for RSG's or such third parties' purposes in an anonymized or aggregated form that is designed to prevent anyone from identifying insureds, prospective insureds, and Producers.

11.05    Producer shall comply with terms imposed by banks, credit card companies and electronic payment vendors authorized to accept credit cards, e-check or EFT (collectively "Electronic Payments"), including, but not limited to, chargeback rules. During the term of this Agreement and after termination Producer agrees to return its portion of fees or commissions required by any chargeback imposed for Electronic Payments as a result of Producer's transactions. The Producer shall notify RSG in writing as soon as practicable if a charge is disputed. Before arranging Electronic Payments, Producer agrees to implement reasonable security procedures designed to maintain security for Electronic Payments, including but not limited to, (a) maintaining a policy that addresses information security for employees and contractors; (b) restricting physical access to cardholder/accountholder information; (c) preventing storing or retaining card validation codes; (d) destroying or purging all media containing obsolete transaction data with cardholder/accountholder information after final transaction authorization; (e) keeping all systems and media containing card account, cardholder or transaction information (whether physical or electronic) in a secure manner so as to prevent access by, or disclosure to any unauthorized party; and (f) using equipment intended to be Payment Card Industry Data Security Standard compliant. Producer agrees not to arrange any Electronic Payment transaction if it has knowledge or notice of any fact or circumstance which would indicate that any Electronic Payment transaction is fraudulent or not authorized by the related cardholder/policyholder or which would otherwise impair the validity or collectability of the cardholder/policyholder's obligation arising from such transaction or relieve the cardholder/policyholder from liability with respect thereto.

11.06    Producer acknowledges that RSG will need to access information about the policyholder from third party interfaces required for underwriting and compliance including, without limitation, address validation, OFAC verification, credit scores, protection class, distance to coast, property inspections, catastrophe modeling and vehicle and driver information.  Producer acknowledges that RSG must investigate every person that is or may be party to a transaction on the Site including all prospective insureds, to ensure that such person or entity is not on the list of Specially Designated Nationals and Blocked Persons issued by the Office of Foreign Assets Control ("OFAC"), a division of the U.S. Treasury Department, as such list may be amended by OFAC from time to time.  The Site shall conduct OFAC checks and comply with all applicable OFAC-related rules and regulations, and the applicable insurer's OFAC-related policies, including, without limitation, any policy that prohibits binding until all names are cleared. Producer represents and warrants that it has obtained legal and effective authorization from its prospective insureds to permit RSG to conduct such investigations. Producer will verify the identity of its customers.

11.07    In conjunction with this Agreement and, in particular, with respect to the Sites, Producer agrees, for itself and on behalf of the policyholder, to transact business with RSG using electronic communications, either via web forms on such Site or via email. Producer expressly consents, for itself and on behalf of the policyholder, to receive all notices, information, and other communications from RSG concerning any subject matter, but, in particular the Sites, via electronic email.  Electronic communications will be deemed received by Producer when Producer's email message system reports that any email message that RSG or a Site sends to Producer has been received by Producer's system, regardless of whether Producer ever actually opens or reads such email. RSG may, but is not required, to use return receipt requests. Producer must maintain a valid email address and update same with RSG through the applicable Sites. RSG may terminate Producer's

**RYAN**
SPECIALTY

Exhibit A - Page 52

access to any Site at any time that RSG determines Producer fails to maintain a valid email address. Producer shall comply will all applicable requirements to provide paper copies of documents to policyholders.

## 12.    Notice

12.01    Any notice under this Agreement by any Party must be in writing by distribution of hard copy to the last known mailing address, via email to agencyadministration@ryansg.com for RSG, via the email address provided by the Producer in conjunction with executing this Agreement for the Producer, or via the Sites or such other electronic portal as enabled by RSG.

12.02    Any notice given by the Producer under Section 12.01 to RSG also will be deemed to be notice to, and for the benefit of, all the Providers.

12.03    Any notice given by RSG under Section 12.01 to the Producer also will be deemed to be notice by, and for the benefit of, all the Providers.

## 13.    Entire Agreement and Construction

13.01    This Agreement constitutes the entire agreement of RSG, the Providers, and the Producer with respect to the subject matter hereof, and supersedes all prior understandings and agreements, whether written or oral, about such subject matter. This Agreement may not be modified, altered or amended without RSG's and the Producer's express written consent, which may be acknowledged via the electronic portal as enabled by RSG.  The Producer may not assign this Agreement without the express written consent of RSG.

13.02    Forbearance, neglect or failure by either Party to enforce any or all of the provisions of this Agreement or to insist upon strict compliance by the Agreement shall not be construed as a waiver of any rights or privileges of such Party. A waiver of a past act or circumstance shall not constitute or be a course of conduct or waiver of any subsequent action or circumstance.

13.03    In case any of the provisions contained in this Agreement are, for any reason, held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the validity of any other provision of this Agreement.

13.04    The section headings in this Agreement are for convenience only; they form no part of this Agreement and shall not affect its interpretation.

13.05    All questions concerning the construction, validity and interpretation of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of Illinois, without giving effect to any choice of law or conflict of law provision (whether of the State of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.

This National Producer Agreement is executed as of the Effective Date indicated below by the Producer.

RSG.NPA.12172018                          Page 10 of 11



Exhibit A - Page 53

**IMPORTANT**

THE FOLLOWING INFORMATION MUST BE PROVIDED TO COMPLETE PROCESSING.  PLEASE RETURN TO agencyadministration@ryansg.com

## PRODUCER

| | |
|---|---|
| Effective Date: | 7/8/2022 |

**Full Name of Agency:**

Fictitious or Assumed Name:  **Manatek Commercial Insurances, Inc.**
If none, please indicate with "none" or "N/A"

Do you have multiple locations/branches/divisions?  No ☒ Yes ☐
For each legal name, entity and/or FEIN included as a Producer under this Agreement, please attach a schedule of locations indicating the applicable legal entity(s), name(s), FEIN(s),  and the office, division or region with which it operates under, and attach a W9 form for each FEIN indicated. Producer must notify RSG promptly of any change in the information provided on the schedule.     FEIN:  20-2389749

| Mailing Address: | Street:  310 WASHINGTON BL | | Suite/Floor:  503 |
|---|---|---|---|
| | City:  MARINA DEL REY | State:  CA | Zip Code:  90292 |

| Physical Address: (if different than above) | Street:  12240 VENICE BL | | Suite/Floor:  12A |
|---|---|---|---|
| | City:  LOS ANGELES | State:  CA | Zip Code:  90066 |

Main Phone Number:  310 390-0777        Main Fax Number:  310 390-0222

Website:  WWW.MANATEKINS.COM

| **Producer Agreement Contact:** Name: | LOLITA SAMARINI | E-mail Address:  lolita@manatekins.com |
|---|---|---|
| | | Phone Number:  310 390-0777 |

| **Accounting Contact:** Name: | NANCY BARBA | Email Address:  accounting@manatekins.com |
|---|---|---|
| | | Phone Number:  310 390-0777 |

Parent Company:  N/A
(If none, please indicate with "none" or "N/A")

By: *Lolita Samarini*

Signature of Producer's Duly Authorized Representative on behalf of all entities indicated above or on the schedule attached hereto

Print Name:

Title:

**Ryan Services Group, LLC**

By: *BMM*

Brendan Mulshine, Executive Vice President

**RYAN** SPECIALTY

Exhibit A - Page 54